# UNITED STATES DISTRICT COURT

for the
District of Colorado

| | |
|---|---|
| In the Matter of the Search of<br>A SILVER APPLE IPHONE WITH UNKNOWN<br>SN, IMEI 356796483344001, and A WHITE APPLE<br>IPHONE WITH UNKNOWN SN, UNKNOWN<br>IMEI, more fully described in Attachment A,<br>attached hereto. | )<br>)<br>)<br>)<br>)<br>)<br>)    Case No.   23-sw-1472-STV |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

**SEE "ATTACHMENT A"**, which is attached to and incorporated in this Application and Affidavit located in the
_____ State and _____ District of <u>Colorado</u>, there is now concealed *(identify the person or describe the property to be seized)*:

**SEE "ATTACHMENT B"**, which is attached to and incorporated in this Application and Affidavit
The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

    ☒ evidence of a crime;
    ☒ contraband, fruits of crime, or other items illegally possessed;
    ☒ property designed for use, intended for use, or used in committing a crime.

The search is related to a violation of:

| *Code Section* | *Offense Description* |
|---|---|
| 21 U.S.C. §§ 841(a)(1) and 846 | Distribution and Possession of Controlled Substances<br>and Conspiracy to commit the same |
| 18 U.S.C. § 922(u) | Knowing Theft of Firearms from Licensee |

The application is based on these facts:

    ☒ Continued on the attached affidavit, which is incorporated by reference.
    ☐ Delayed notice of ____ days (give exact ending date if more than 30 days: _____) is requested under
    18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____*s/Adam Omansky*_____
*Applicant's signature*

SA Adam Omansky, ATF
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:   October 31, 2023

_____
*Judge's signature*

City and state:   Denver, CO

Scott T. Varholak, U.S. Magistrate Judge
*Printed name and title*

**ATTACHMENT A-1**

**DESCRIPTION OF LOCATION TO BE SEARCHED**

This application seeks authorization to search a cellular telephone:

1) A Silver Apple iPhone cellular telephone with unknown serial number and IMEI 356796483344001 contained within a dark grey case.

The items to be searched are hereinafter referred to as "the Devices." The Devices were initially seized by law enforcement on October 26, 2023, in Aurora, Colorado. The Devices are currently stored at the Denver ATF evidence locker, located at 950 17th St., Denver, CO 80202.





**ATTACHMENT A-2**

**DESCRIPTION OF LOCATION TO BE SEARCHED**

This application seeks authorization to search a cellular telephone:

1) A White Apple iPhone cellular telephone with unknown serial number and unknown IMEI.

The items to be searched are hereinafter referred to as "the Devices." The Devices were initially seized by law enforcement on October 26, 2023, in Aurora, Colorado. The Devices are currently stored at the Denver ATF evidence locker, located at 950 17th St., Denver, CO 80202.

 

## ATTACHMENT B

## DESCRIPTION OF ITEMS TO BE SEIZED AND SEARCHED

For the Devices listed and described in Attachment A, the following items, which constitute evidence of the commission of, the fruits of the crime, and/or instrumentalities of violations of: Title 21, United States Code, Sections 841(a)(1) and 846, Possession of Controlled Substances with the Intent to Distribute and Conspiracy to Commit the Same, and Title 18, United States Code, Section 922(u), Knowing Theft of Firearms from Licensee (the "Subject Offenses"), specifically between the dates of October 25, 2023 through October 27, 2023.

1.  The assigned telephone number associated with the cellular phone and any other identifying information about the device (ESN, MIN, IMSI, or IMEI);

2.  The electronically stored phone book or contact list;

3.  The call log, to include the record of incoming, outgoing, and missed calls;

4.  Any and all information, ledgers, photographs, videos, spreadsheets, notes, software, documents, records, emails, text messages, programs, or other communications or correspondence, in any format and medium, pertaining to violations of the Subject Offenses;

5.  Any and all information related to the purchase, production, sale, or manufacture of controlled substances;

6.  Bank and financial institution records and other records of financial transactions related to the commission of the Subject Offenses and the collection and/or disposition of related proceeds;

7.  Information tending to identify individuals engaging in the Subject Offenses, and their co-conspirators, such as address books, contact lists, and communication records and identification documents, personal calendars, planners, itineraries, and travel records;

8.  Location data tending to show participation in events relevant to the Subject Offenses, such as GPS data and cell site data;

9.  Records of internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any internet search engine, and records of user-typed web addresses pertaining to the Subject Offenses.

10. Records of or information about Internet Protocol addresses used by the Devices;

11. Information about usernames or any online accounts or email addresses associated with the user of the Devices;

12. Passwords, encryption keys, and other access devices that may be necessary to access the Devices;

13. Evidence of who used, owned, or controlled the Devices at the time the items described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, calendars, browsing history, user profiles, e-mail, e-mail contacts, "chat" or instant messaging logs, photographs, and correspondence;

14. Contextual information necessary to understand the evidence described in this attachment;

15. Social media applications present on the device, including Snapchat, Instagram and Facebook, as these applications may contain GPS and location information indicating where the phone has been used; photographs and/or videos showing the identity of the device owner/user, the identity of known and unknown coconspirators, discussions pertaining to narcotics or firearms, including the acquisition and distribution thereof.

16. Any and all financial records, including bank account or credit card account information, to include account applications, statements, receipts, checks, deposit slips, receipts, disbursement journals, record of cash transactions, money orders, cashier's check, check stubs, check registers and checking and savings account documents.

17. Stored digital images, in any format (to include any associated metadata) which depict information pertinent to the Subject Offenses such as: potential co-conspirators, firearms and their accessories, proceeds, trip information, narcotics, and narcotics-related paraphernalia.

<u>DEFINITIONS</u>:

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as hard disks or other media that can store data); any memorialized handmade form (such as writing, drawing, painting); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

If the government identifies seized communications to/from an attorney, the investigative team will discontinue review until a filter team of one or more government attorneys and other government personnel, as needed, is established. The filter team will have no previous or future involvement in the investigation of this matter. The filter team will identify and segregate communications to/from attorneys, which may or may not be subject to attorney-client privilege. At no time will the filter team advise the investigative team of the substance of any of the communications to/from attorneys. The filter team then will provide all communications that do not involve an attorney to the investigative team, and the investigative team may resume its review. If the filter team believes that any of the communications to/from attorneys are not actually privileged (e.g., the communication includes a third party), and if the investigation is not covert, the filter team will first seek to obtain agreement from the appropriate defense counsel before providing these attorney communications to the investigative team. If consulting with defense counsel is not possible or does not produce an agreement, the filter team will obtain a court order before providing these attorney communications to the investigative team.

## AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

I, Adam Omansky, a Special Agent (SA) with the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF), being duly sworn, hereby depose and state that the following is true to the best of my information, knowledge, and belief:

## INTRODUCTION AND AGENT BACKROUND

1.      Your Affiant, Adam Omansky, is a Special Agent (SA) with the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF), United States Department of Justice, within the meaning of Title 18, United States Code, Section 3051, that is an officer of the United States empowered by law with the duty of enforcing any of the criminal, seizure, or forfeiture provisions of the laws of the United States.

2.      Your Affiant has been an ATF Special Agent for over one year.  Your Affiant's primary duties consist of the enforcement of federal firearms laws, armed narcotics trafficking, and conspiracy laws.  Your Affiant has participated in numerous federal firearms and narcotics investigations as an ATF Special Agent in which narcotics and firearms used in violation of federal law have been recovered.  Your Affiant also conducted and/or participated in such investigations as a sworn police officer in the State of Colorado.  Prior to becoming an ATF Special Agent, Your Affiant was a Police Agent with the Lakewood Police Department (LPD) in Lakewood, Colorado for over 3 ½ years.  As a Police Agent, Your Affiant was assigned to the patrol division.  Your Affiant's duties involved responding to calls for service and proactive policing.  Your Affiant has made over 140 felony and misdemeanor arrests during my tenure.  Your Affiant investigated cases of serious violent crime to include but not limited to, Robbery, Aggravated Assault, Narcotics Crimes, Unlawful Possession of Dangerous Weapons, and Unlawful Discharge of Firearms.  Your Affiant has also investigated cases of property crimes including but not limited to, Burglary of a Dwelling, Burglary of a Business, 1st Degree Aggravated Motor Vehicle Theft and Criminal Trespassing.

3.      Your Affiant has received training and instruction related to investigating armed drug traffickers and conspiracy laws.  You Affiant works with and benefits from the knowledge of other law enforcement officers with decades of experience enforcing federal firearms laws, investigating armed drug traffickers and conspiracy laws.  Your Affiant investigates violations of federal firearms laws, federal narcotics laws and illegal firearms trafficking in the normal course of his duties and is familiar with the facts of this case.

4.      Your Affiant makes this affidavit in support of an application for a search warrant to search two cellular phones ("the Devices").  The Devices are as follows: (1) a Silver Apple iPhone cellular telephone, unknown serial number and IMEI 356796483344001 contained in a dark grey case; and (2) a White Apple iPhone cellular telephone, unknown serial number and unknown IMEI.  The Devices, which are more fully described in Attachment A, were recovered from the possession of Brayan ENRIQUEZ.  Attachment B identifies with particularity the evidence your Affiant seeks permission to search for and seize.

1

5.      The devices were initially seized by law enforcement officers on October 26, 2023, in Aurora, Colorado from Brayan ENRIQUEZ.  In your Affiant's training and experience, the Devices have been stored in a manner in which the contents are, to the extent material to this investigation, in substantially the same state as they were when the devices first came into the possession of law enforcement.

6.      The applied-for warrant would authorize the forensic examination of the devices identified in Attachment A for the purpose of identifying electronically stored data particularly described in Attachment B.  Based on the information below, there is probable cause to believe the devices described in Attachment A contain evidence described in Attachment B.  As set forth below, there is probable cause to believe that the devices contain evidence of Title 21, United States Code, Sections 841(a)(1) and 846, Possession of Controlled Substances with the Intent to Distribute and Conspiracy to Commit the same, and Title 18, United States Code, Section 922(u), Knowing Theft of Firearms from Licensee.

7.      The facts in this affidavit come from my personal observations, my training and experience, my review of documents, and information obtained from other agents and witnesses. Because this affidavit is being submitted for the limited purpose of securing a search warrant, I have not included each and every fact known to me concerning this investigation.  I have set forth facts that I believe are necessary to establish probable cause to believe that evidence, fruits, and instrumentalities of violations of Subject Offenses are located in the Devices described in Attachment A.

## TECHNICAL TERMS

8.      Based on my training and experience, I use the following technical terms to convey the following meanings:

    a.   A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones.  A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone.  In addition to enabling voice communications, wireless telephones offer a broad range of capabilities.  These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet including websites, social media sites, bulletin boards, file sharing, and other Internet sites.  Wireless telephones often have a subscriber identity module or subscriber identification module ("SIM"), which is an integrated circuit that securely stores the International Mobile Subscriber Identity ("IMSI") and the related key used to identify and authenticate subscribers on mobile telephone devices.  A SIM is embedded into a removable "SIM card,"

2

which can be transferred between different mobile devices. A SIM card contains a unique serial number ("ICCID"), IMSI, security authentication and ciphering information, temporary information related to the local network, a list of the services to which the user has access, and certain passwords. Most SIM cards will also store certain usage data, such as call history, text ("SMS") messages, and phone book contacts. Wireless telephones may also be "smartphones," such that they operate as personal computers capable of accessing the Internet. They may also include GPS technology for determining the location of the device. Such telephones may also contain removable storage media, such as a flash card—such devices can store any digital data and can have the capacity to store many gigabytes of data. Some cellular telephones also have software, giving them the same capabilities as personal computers including accessing and editing word processing documents, spreadsheets, and presentations. Some cellular telephones also operate as a "tablet," or mobile computer, and can contain software programs called applications or "apps". Apps, like programs on a personal computer, perform different functions and save data associated with those functions. Apps can, for example, permit accessing the Web, sending and receiving e-mail, and participating in Internet social networks. Those programs can perform different functions and save data associated with those functions, including use associated with the Internet.

b. Digital camera: Most cellular telephones and computers are equipped with a digital camera. A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

c. Portable media player: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d. GPS: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records of the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations

3

involved in such navigation.  The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth.  Each satellite contains an extremely accurate clock.  Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers.  These signals are sent by radio, using specifications that are publicly available.  A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e.   IP Address:  An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet.  An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination.  Most Internet service providers control a range of IP addresses.  Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

f.   Internet:  The Internet is a global network of computers and other electronic devices that communicate with each other.  Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

9.      Based on my training, experience, and research, and from consulting the manufacturers' advertisements and product technical specifications available online, I know that the Devices have capabilities that allow them to serve as wireless telephones, digital cameras, portal media players, GPS navigation devices, and they can access the Internet.  In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the Devices.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

10.     Based on my training and experience, Your Affiant is aware of the following about cellular phones, hereinafter and below and in the Attachments "Devices."

11.     Based on my knowledge, training, and experience, Your Affiant knows that computers and digital storage devices can store information for long periods of time.  Similarly, things that have been searched for and viewed via the Internet are typically stored for some period of time on a device.  This information can sometimes be recovered with forensic tools.

12.     Based on my knowledge, training, and experience, examining data stored on computers and digital storage devices can uncover, among other things, evidence that reveals or suggests who possessed or used the computer or digital storage devices.

13.     There is probable cause to believe that things that were once stored on the Devices may still be stored there, for at least the following reasons:

     a.  Based on my knowledge, training, and experience, I know that digital files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost.  Even when files have been deleted, they can be recovered months or years later using forensic tools.  This is so because when a person "deletes" a file on a digital storage device, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

     b.  Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, an operating system may also keep a record of deleted data in a "swap" or "recovery" file.

     c.  Wholly apart from user-generated files, digital storage devices can contain electronic evidence of how a digital storage device has been used, what it has been used for, and who has used it.  To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files.  Digital storage devices users typically do not erase or delete this evidence, because special software is typically required for that task.  However, it is technically possible to delete this information.

     d.  Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache." Forensic review may also disclose when and by whom the Internet was used to conduct searches, view material, and communicate with others via the Internet.

14.     *Forensic evidence.*  As further described in Attachment B, this application seeks permission to locate not only electronically stored information on the Devices that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the Devices were used, the purpose of the use, who used the Devices, and when.  There is probable cause to believe that this forensic electronic evidence might be on the Devices because:

     a.  Data on the storage medium can provide evidence of a file that was once on the storage media but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).  Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active.  Web browsers, e-mail programs, and chat programs store configuration information on the storage

medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer or device was in use. Digital storage devices' file systems can record information about the dates files were created and the sequence in which they were created. This information can be recovered months or even years after they have been downloaded onto the storage medium, deleted, or viewed.

b.  Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c.  A person with appropriate familiarity with how a digital storage device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d.  The process of identifying the exact electronically stored information on storage media that are necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a digital storage device is evidence may depend on other information stored on the digital storage device and the application of knowledge about how a computer or digital storage device behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.  Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

f.  Your Affiant knows that a significant percentage of controlled substances imported into the United States (U.S.) currently enters the domestic market at various points along the Southwest border and is then transported to various cities throughout the country for retail distribution. Furthermore, I know that the importation, transportation, and distribution of controlled substances are controlled by a number of well-organized and sophisticated drug trafficking organizations. I also know that drug trafficking organizations transport drugs by vehicle, bus and aircraft from Mexico to various distribution centers in the U.S.; cash proceeds of drug sales from points of distribution in the U.S. are then transported back to the sources of supply in Mexico, or often along the Southwest border, where the proceeds are laundered.

g.  That members of these organizations routinely utilize communication facilities including cellular telephones calls, electronic text messaging, and messaging applications accessible on cellular telephones, to communicate with other organization members in furtherance of their illegal goals. During the course of these electronic communications, organization members commonly use coded language and references and/or encryption in an effort to elude law enforcement detection. Based on training and experience, I know that narcotics traffickers commonly use multiple, prepaid, or "throw away" cellular telephones to avoid detection and elude law enforcement, and said traffickers also change cellular

phones frequently or use multiple cellular phones to avoid detection by law enforcement officials.

h.   That drug dealers use cellular phones and other communication devices, in which they maintain names, addresses, and/or telephone numbers of their associates in the narcotics trafficking organization and customers of narcotics.

i.   That drug traffickers store information pertaining to drug trafficking activities on cell phones.  I further know, based on my training and experience, as well as from information relayed to me during the course of my official duties, that drug trafficking organizations often retain, for long periods of time, such electronic documents and devices, in order to maintain a record of contacts, accounts, income, expenditures, assets, and drug-related debts.

j.   That it is common practice for large scale narcotics traffickers to travel to their purchase and distribution areas to facilitate their trafficking; that after purchasing drugs, narcotics traffickers will transport or cause to be transported narcotics to areas in which they will distribute the drugs; and that methods of transportation include commercial airlines, private airplanes, trains, buses, and rental and private automobiles.  I further know that narcotics traffickers often store electronic copies of records and receipts to such travel on digital devices such as cell phones. Similarly, geolocation information stored on devices also may reveal travel and patterns of travel material to the acquisition and distribution of controlled substances.

k.   That drug and firearms traffickers take or cause to be taken photographs or videos of themselves, their associates, their property, and their product.  These traffickers often maintain these electronic images stored on digital devices such as cell phones.  One purpose for doing so appears to be to show and confirm they are in possession of the product they seek to distribute.

l.   That drug trafficking organizations maintain a variety of documents related to drug trafficking, including ledgers, hotel receipts, wire transfer paperwork, apartment rental agreements, cell phone bills, passports, photographs, credit card bills, credit cards, vehicle registration documents, vehicle rental receipts, utility bills, and other documents that provide evidence of the illegal conduct of such organizations. I further know that narcotics traffickers often store digital versions of such documents in electronic devices such as cell phones.

m.  I am also aware that firearms are a tool of the trade for drug traffickers.  Because they are engaged in an illegal business, narcotics traffickers cannot simply call the police if a deal goes bad, if they are shorted, or if they are robbed of their product.  Thus, it is common for narcotics traffickers to carry and possess firearms to protect their illegal drugs and the illicit proceeds thereof.  Moreover, drugs may be traded for firearms and firearms may be used to launder the proceeds of illegal narcotics transactions.  Persons who illegally possess firearms also commonly take pictures with those firearms, either to share or to facilitate trades or transactions involving those weapons.

n.   Proceeds from illegal narcotics transactions may need to be legitimized so that they can be introduced into the banking system.  Additionally, it is increasingly common for narcotics tranactions to be paid for using cash transfers on mobile devices.  Similarly, mobile devices may contain information related to the

7

repatriation of those proceeds to the sources of supply, including dealers and producers outside of the U.S.  Mobile devices which are used in relation to narcotics trafficking frequently contain such information, which helps to establish the scope of the activity and to further identify both customers and sources of supply.

o.  Your Affiant knows that when an individual uses an electronic device to aid in the commission of a crime, particularly crimes involving drug distribution and unlawful possession and distribution of firearms, the individual's electronic device will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime.  The electronic device is an instrumentality of the crime because it is used as a means of committing the criminal offense.  The electronic device is also likely to be a storage medium for evidence of crime.  From my training and experience, I believe that an electronic Devices used to commit Subject Offenses of this type may contain: calls and voicemails between suspects and co-conspirators ; text messages between suspects and co-conspirators; GPS searches and information associated with traveling in order to scout locations narcotics transactions; GPS searches and information associated with traveling in order to distribute narcotics; internet searches pertaining to targeted  locations, relating to narcotics and/or firearms; photographs and/or videos exchanged between an individual suspects and co-conspirators involved in, distributing narcotics and individuals attempting to purchase narcotics; social media apps such as Facebook or Instagram, where the phone owner may be communicating with others regarding narcotics or firearms; email accounts with emails containing communications of drug distribution and unlawful firearm possession.  Additionally, devices are often used to call, text, send photos and email information to criminal associates before, during, and after crimes to assist in the crimes both in planning, executing, and fleeing from the crime scene, and that information is likely contained in the memory of the cell phone.  In addition, people involved in the distribution of narcotics are likely to communicate using texts, email, or by phone to arrange to further their criminal activity.

p.  Your Affiant also knows that those who engage in criminal activity will attempt to conceal evidence of the activity by hiding files, by renaming the format, (such as saving a .pdf image file as a .doc document file) or by giving them deceptive names such that it is necessary to view the contents of each file to determine what it contains.

15.     *Need to review evidence over time and to maintain entirety of evidence.*  Your Affiant recognizes the prudence requisite in reviewing and preserving in its original form only such records applicable to the violations of law described in this Affidavit and in Attachment B in order to prevent unnecessary invasion of privacy and overbroad searches. Your Affiant advises it would be impractical and infeasible for the Government to review the mirrored images of digital devices that are copied as a result of a search warrant issued pursuant to this Application during a single analysis.  Your Affiant has learned through practical experience that various pieces of evidence retrieved from digital devices in investigations of this sort often have unknown probative value and linkage to other pieces of evidence in the investigation until they

8

are considered within the fluid, active, and ongoing investigation of the whole as it develops.  In other words, the weight of each individual piece of the data fluctuates based upon additional investigative measures undertaken, other documents under review and incorporation of evidence into a consolidated whole.  Analysis is content-relational, and the importance of any associated data may grow whenever further analysis is performed. The full scope and meaning of the whole of the data is lost if each piece is observed individually, and not in sum. Due to the interrelation and correlation between pieces of an investigation as that investigation continues, looking at one piece of information may lose its full evidentiary value if it is related to another piece of information, yet its complement is not preserved along with the original.  In the past, your Affiant has reviewed activity and data on digital devices pursuant to search warrants in the course of ongoing criminal investigations.  Your Affiant has learned from that experience, as well as other investigative efforts, that multiple reviews of the data at different times is necessary to understand the full value of the information contained therein, and to determine whether it is within the scope of the items sought in Attachment B.  In order to obtain the full picture and meaning of the data from the information sought in Attachments A and B of this application, the Government would need to maintain access to all of the resultant data, as the completeness and potential of probative value of the data must be assessed within the full scope of the investigation.  As such, your Affiant respectfully requests the ability to maintain the whole of the data obtained as a result of the search warrant, and to maintain and to review the data in the control and custody of the Government and law enforcement at times deemed necessary during the investigation, rather than minimize the content to certain communications deemed important at one time.  As with all evidence, the Government will maintain the evidence and mirror images of the evidence in its custody and control, without alteration, amendment, or access by persons unrelated to the investigation.

16.     *Nature of examination*.  Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, copying and reviewing the contents of the device consistent with the warrant.  The warrant I am applying for would authorize a later examination and perhaps repeated review of the device or information from a copy of the device consistent with the warrant.  The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

## PROBABLE CAUSE

### Investigation

17.     Your Affiant became involved in an investigation into the activities of Brayan ENRIQUEZ and Johnathan LEIVA in October 2023.  This investigation stemmed from ENRIQUEZ and LEIVA's involvement of a burglary of the Federal Firearm Licensee (FFL # 584031066B10762) named Denver Bullets, which is located at 1600 West 13th Avenue in Denver, Colorado.  Your Affiant, the secondary investigator, reviewed the Denver Police Report 2023 – 577358, titled Burglary of a Business.

## Denver Police Report 2023-577358

18.     On October 25, 2023, Denver Police Department (DPD) officers were dispatched to the business named Denver Bullets, located at 1600 West 13th Avenue, regarding a reported burglary.  Officers arrived at the burglary site and contacted the reporting parties, MM and RS. RS reported that at the time of the burglary, the business was occupied by several employees; however, based on the location of the employees, the employees did not see the suspects enter the business and or remove the stolen firearms.

19.     RS explained that the storefront of the business was left unattended for approximately 15 minutes.  RS stated MM, a store employee, received a phone call at 3:39 p.m. from a witness, who expressed that he observed people tossing firearms into a bag, which raised his suspicion.  RS relayed that MM informed him of this information, which caused him to begin to investigate the passerby claim.  MM and RS went to the storefront and entered the business; this section of the business held firearms on display for sale.  RS performed a quick inspection and noticed that several firearms had been taken without his permission or consent.  MM reported that approximately 20 handguns and 8 rifles were missing at the initial report.

20.     The officers contacted the witness, identified as JP, and conducted a field interview with JP, who stated the following: As he drove away from his nearby place of employment, he observed two kids at West 13th Avenue and North Quivas Street carelessly toss AR-15-style rifles into a rubber tote and into a car.  JP relayed that this caused him suspicion, and he phoned the owner of the business.  JP described the vehicle as a sedan, possibly a Toyota Corolla, black or gold in color, bearing a partial California plate of "7RSQ."  JP described the suspects as two Hispanic males, approximately 18 years of age.

### YOUR AFFIANT'S INVOLVEMENT

21.     On October 26, 2023, your Affiant was notified of the investigation.  Your Affiant responded to the scene to conduct a subsequent investigation.  Your Affiant arrived at 1600 West 13th Avenue and spoke with DPD Detective Michael Clark, the principal investigator.  Detective Clark informed your Affiant of the investigation's details and the surveillance still images of the suspect.

## Image Scanning Through the Division Of Motor Vehicles

22.     With the surveillance still images provided of the suspect, ATF Analyst Andy Morrow completed an image scanning request form generated by the Department of Revenue – Division of Motor Vehicle (DMV).  ATF Analyst Morrow attached the below-listed images to the form and submitted a formal request for the DMV to conduct an image scan of the suspects against DMV records, specifically Colorado driver's licenses.  Your Affiant included the images below as a reference to illustrate the images provided to ATF Analyst Morrow.



Suspect A          Suspect B          Suspect A          Suspect A

23.    TFO Sloan received notification that the DMV located a possible match of the suspects involved in the burglary.  Furthermore, the notification indicated that the information provided is considered a crime-stopper tip and not probable cause for an arrest and that further investigative techniques will need to be applied.  Your Affiant received the following information:

### Suspect A

24.    The DMV indicated that Suspect A resembles an individual named Brayan ENRIQUEZ with a date of birth of October 08, 2003.  As explained below, this was ultimately identified as suspect A in the photographs above.



### Suspect B

25.    The DMV indicated that Suspect B resembles an individual named Raymond Joseph Casias-Martinez.  As explained further below, it was ultimately determined that Casias-Martinez was not involved in the crime.

26.     Based on the information provided, investigators began researching the last known addresses of the alleged suspects.  Your Affiant would like to inform the courts that the information provided by the DMV was only utilized as a tool to further the investigation.

27.     Investigators learned that Brayan ENRIQUEZ's last known address was 2050 Nome Street, in Aurora, Colorado.  Further, investigators learned Joseph Casias-Martinez's last known address was 9280 Fir Drive in Thornton, Colorado.

### 2050 Nome Street

28.     Several investigators responded to 2050 Nome Street in Aurora, Colorado. Investigators immediately noticed that the residence was vacant; specifically, the residence had a for sale displayed.  Investigators knocked on the door and learned that the house was vacant. Based on the discovery, Investigators left the residence and began searching for additional addresses.

### 9280 Fir Drive

29.     ATF responded to 9280 Fir Drive in Thornton, Colorado.  ATF established surveillance at this location.  As agents approached the residence, TFO Gerald Sloan learned that Casias-Martinez was not involved in the FFL burglary.

30.     Your Affiant learned that through several law enforcement databases, Brayan ENRIQUEZ had crossed the United States border with an individual named Jonatan LEIVA. Investigators immediately obtained LEIVA's Colorado driver's license dossier, which included his photograph.

31.     TFO Sloan conducted a side-by-side comparison of LEIVA with the still images of the suspect.



32.     Based on the comparison, your Affiant identified LEIVA as a potential suspect in the FFL burglary and eliminated CASIAS-MARTINEZ as the second suspect.

**1214 Ironton Street**

33.     ATF agents and investigators responded to 1214 Ironton Street.  ATF Group Supervisor Jason Cole knocked on the residence's front door and was greeted by Patricia Gonzalez-Carpio, Gregorio Leiva, and Mailbely Gonzalez-Leiva.  Standing at the front door's threshold, Cole asked if LEIVA was home.  They informed Cole that LEIVA was in his bedroom.  Cole inquired if he could speak with LEIVA regarding the investigation.  Mailbely Gonzalez-Leiva acquiesced to the request and went to get LEIVA.  A few minutes later, LEIVA appeared, and Cole spoke with LEIVA as he stood at the front door.  LEIVA, without being requested, sat on the step of the residence.  Cole noted that he spoke with LEIVA in a conversational tone and did not display a weapon.  Further, Cole relayed that LEIVA was not placed in handcuffs during the non-custodial interview.  The interview was audio recorded.  The following is not a transcript or exhaustive summary of the interview with LEIVA but rather is intended to provide limited excerpts of the substance of the interview that are pertinent.

34.     Cole informed LEIVA that ATF was investigating firearms stolen yesterday, October 25, 2023.  LEIVA said he was at work all day yesterday at his family-owned painting company.  Cole had previous knowledge from criminal justice databases that LEIVA crossed the United States border with Brayan ENRIQUEZ.  Cole showed LEIVA a Colorado DMV Photograph of ENRIQUEZ.  LEIVA denied knowing ENRIQUEZ.  GS Cole showed LEIVA still photographs from the surveillance footage of the firearms theft from Denver Bullets on October 25, 2023 (Fig. 1-2).  LEIVA stated he was the person in the photograph (Fig. 2).  LEIVA denied knowing if ENRIQUEZ was the other person who was with him.



Figure 1                              Figure 2

13

35.     LEIVA was placed into handcuffs and detained.  Investigators spoke with Patricia and Gregorio and asked for consent to search their residence—1214 Ironton St.  The parents verbally agreed to the search and signed ATF Form 3220.11 Consent to Search.  Later, LEIVA was asked for consent to search his room inside the residence—1214 Ironton St.  LEIVA verbally agreed to the search and signed ATF Form 3220.11 Consent to Search.

36.     LEIVA asked Cole if he could speak with investigators somewhere else.  LEIVA was led to an unmarked police car.  LEIVA was uncuffed from one hand.  LEIVA was formally advised by Cole with the utilization of ATF Form 3200.4 Advice of Rights and Waiver.  LEIVA knowingly and voluntarily waived his Miranda rights and agreed to speak with agents.  LEIVA signed ATF form 3200.4 Advice of Rights and Waiver.

37.     LEIVA said that he was at work yesterday, October 25, 2023, and got off early.  LEIVA estimated he got home at 1400 hours.  When LEIVA got home, he took the dog for a walk around the neighborhood.  As LEIVA was returning home, he saw ENRIQUEZ's car drive by.  LEIVA said that it was a black or dark-colored vehicle and said it was possibly a Honda.

38.     LEIVA knows ENRIQUEZ as "Tony," hereinafter referred to as ENRIQUEZ.  ENRIQUEZ stopped and asked if LEIVA wanted to hang out.  LEIVA got into ENRIQUEZ's car, and they went to get cigarettes.  LEIVA said ENRIQUEZ got a call from an unknown person asking if ENRIQUEZ wanted to go shooting at a shooting range.  ENRIQUEZ asked LEIVA if LEIVA wanted to go.  LEIVA agreed to go.  LEIVA said he does not own a gun, and he did not think that ENRIQUEZ owned a firearm.  ENRIQUEZ told LEIVA that they needed to go get ammunition.

39.     LEIVA said they only went to one store.  When they got there, they entered the store, knocked, and rang the bell attached to the front door.  LEIVA said they checked the door, and it was open, so they went in.  LEIVA said that it was strange because no one was there.  ENRIQUEZ said that they could take things, and LEIVA became uncomfortable.  ENRIQUEZ told LEIVA to go to the car.  LEIVA went to ENRIQUEZ's vehicle and waited.  LEIVA thought that ENRIQUEZ told him to start the car.  LEIVA said that ENRIQUEZ came out with a box and something else full of firearms.  ENRIQUEZ put the firearms in the back seat of the car.  LEIVA was in the passenger seat, and ENRIQUEZ got in the driver's seat.  ENRIQUEZ then drove them away from the store.  LEIVA asked ENRIQUEZ what they had just done.  ENRIQUEZ apologized to LEIVA and said he was sorry for getting LEIVA involved.  LEIVA asked to be taken home.  ENRIQUEZ dropped LEIVA off several blocks away and made him walk home.  LEIVA said that ENRIQUEZ took all the guns, and he did not take any.

## Consent to Search

40.     Investigators searched LEIVA's bedroom and found the matching jacket worn by one of the suspects.

 

**Identification of Suspects**

41.     Investigators spoke to LEIVA's brother Joel Leiva.  Joel stated that on October 25, 2023, he received a telephone call from LEIVA stating something was about to go down.

42.     Special Agent Matt Pound showed LEIVA's parents the still photographs from the surveillance footage of the firearms theft from Denver Bullets on October 25, 2023 (Fig. 1-2).  LEIVA's parents stated they recognized ENRIQUEZ.  They stated that ENRIQUEZ is LEIVA's friend and always comes around.

43.     Based on the discovery of the jacket, coupled with LEIVA's admissions and identification by parents, your Affiant affirmed that LEIVA and ENRIQUEZ were involved in the burglary of the gun store.

**SUBJECT PREMISES 2221 NEWARK STREET**

44.     ATF next responded to 2221 Newark Street in Aurora, Colorado (the "Subject Premises").  The Subject Premises was attributed to ENRIQUEZ through several law enforcement databases.  Investigators had previous knowledge that ENRIQUEZ was wanted for two (2) Misdemeanor Warrant for failing to appear (FTA) Traffic in Arapahoe County, Colorado.  ATF agents went to the residence's front door, while other agents went to a position to watch the residence's rear.

45.     ATF TFO Cassie Longnecker knocked on the residence's front door, and a female, later identified as Stephanie Enriquez (later identified to be the sister of ENRIQUEZ), answered the door.  TFO Longnecker asked Stephanie if ENRIQUEZ was home.  Stephanie

15

stated that ENRIQUEZ was not home.  TFO Longnecker heard over the police radio that TFO Chrachol had just observed two males attempting to flee the rear of the residence.  One male was approximately 20 years old, and the other male was much older.  Both males then returned inside the residence and out of view of TFO Chrachol.  It is believed that the younger person seen attempting to flee was ENRIQUEZ, and the older one was ENRIQUEZ' father—agents do not suspect that the father was involved in the theft at this point.  TFO Longnecker confronted Stephanie with this information, and Stephanie said that ENRIQUEZ might be in the game room. Stephanie went to check for ENRIQUEZ.  Stephanie returned to the front door with ENRIQUEZ following behind her.

46.     TFO Longnecker recognized ENRIQUEZ from his Colorado Driver's License photograph.  TFO Longnecker noted that ENRIQUEZ physical appearance matched one of the suspects depicted in the still photographs from the surveillance footage of the firearms theft from Denver Bullets on October 25, 2023.  *See* paragraph 22.

47.     ENRIQUEZ voluntarily exited the residence.  TFO Longnecker explained to ENRIQUEZ that investigators were looking into a burglary or theft that occurred on October 25, 2023.  ENRIQUEZ said he did not know anything about the specific crime.  TFO Longnecker asked if ENRIQUEZ lived at 2221 Newark Street, and he said he did not.  ENRIQUEZ refused to tell investigators where he lived.  TFO Longnecker asked ENRIQUEZ if he had a couple of warrants for his arrest.  ENRIQUEZ said he thought he had warrants.

48.     ENRIQUEZ was arrested for misdemeanor warrants and transported to the Aurora City Jail at 14999 East Alameda Parkway, Aurora, CO 80012.  During the booking process, ENRIQUEZ was asked what his address was, and he said that he did not know his address, but he had been living at the address where police contacted him—the Subject Premises—for the past two years.

49.     ATF agents remained outside of 2221 Newark St. with Stephanie.  Stephanie and ENRIQUEZ' father, Thomas Enriquez, remained inside with Stephanie's juvenile child.  ATF Group Supervisor (GS) Alan Breneman and SA Joshua Sherman arrived at 2221 Newark Street and spoke with Stephanie.  Stephanie voluntarily invited GS Breneman and SA Sherman inside the residence.  During conversation, Stephanie said that ENRIQUEZ had been living at the residence for the past month and indicated one of the bedrooms as belonging to him.

50.     Investigators believed probable cause existed to hold the residence in anticipation of an impending search warrant.  For officer/agent safety, a protective sweep was conducted.

51.     GS Breneman and SA Sherman showed Stephanie the still photographs from the surveillance footage of the firearms theft from Denver Bullets on October 25, 2023.  *See* paragraph 22.  Stephanie stated that her brother ENRIQUEZ was one of the males in the photographs and stated the other male was ENRIQUEZ' friend, "Johnny" (Jonathan LEIVA).

## Search Warrant of 2221 Newark Street

52.     On October 26, 2023, U.S. Magistrate Judge Scott T. Varholak issued a federal search warrant for the residence of 2221 Newark Street, Aurora, Colorado 80010.

53.     Law enforcement officers maintained control of the premises to prevent alteration, concealment, or destruction of evidence.  The residents of 2221 Newark Street that were on scene were:

    a.  Stephanie Enriquez, Stephanie's juvenile daughter, Thomas Enriquez, and Veronique Thurston-Perales (ENRIQUEZ's girlfriend).

54.     The following law enforcement personnel were present at 2221 Newark Street:

    a.  GS Alan Breneman, GS Jason Cole, SA Jovianne Demas, SA Adam Omansky, SA Joshua Sherman, SA Joel Hegarty, SA Joseph Acosta, SA Samuel Thompson, SA Seth Gilluly, SA Tim Pine, TFO Vina Maciel, TFO Matthew Ingui, TFO Daniel Pell, TFO Brianna Monson, TFO Aaron Anderson.

55.     The search warrant of the residence was executed at approximately 2322 hours. SA Thompson took an entry video of the residence prior to agents conducting the search for items listed in the search warrant.  As the items to be seized were located, they were photographed in place by SA Thompson and recovered.

56.     The following evidence was recovered.  ENRIQUEZ' bedroom was designated as Room H:

    b.  A white iPhone found on the bed (ATF Property Item # 00001) (Found by SA Hegarty in Room H);

    c.  A Silver iPhone in a Dark Grey Case (ATF Property Item # 00002) (Found by TFO Sloan in Room G—the household kitchen);

    d.  Glock, model 23, .40 caliber pistol, bearing serial number BVN4254 (ATF Property Item # 00003) (Found by SA Gilluly in Room H);

    e.  13 Rounds Winchester .40 caliber ammunition loaded inside the magazine of Item 0003 (ATF Property Item # 00004) (Found by SA Gilluly in Room H);

    f.  Eight (8) assorted 7.62 x 39 rounds ammunition (ATF Property Item # 00005) (Found by SA Omansky in Room H);

    g.  One (1) Round 5.56 ammunition (ATF Property Item # 00006) (Found by SA Pine in Room H);

    h.  Ten (10) Rounds .45 caliber Ammunition (ATF Property Item # 00007) (Found by SA Pine in Room H);

    i.  Two (2) Apple iPhones (ATF Property Item # 00008) (Found by SA Pine in Room H);

    j.  Approximately 1.5 grams of suspected methamphetamine (tested presumptive positively for methamphetamine) (ATF Property Item # 00009) (Found by SA Omansky in Room H);

k.  Approximately 148.5 grams of suspected heroin (ATF Property Item # 00010) (Found by TFO Monson in Room H) (tested presumptive positively for heroin);

l.  Approximately 736 grams of suspected heroin (ATF Property Item # 00011) (Found by TFO Monson in Room H) (tested presumptive positively for heroin);

m.  Approximately 719 grams of suspected cocaine (tested presumptive positively for cocaine) (ATF Property Item # 00012) (Found by TFO Monson in Room H) (tested presumptive positively for cocaine);

n.  White bag containing items 0010 and 0011 (ATF Property Item # 00013) (Found by TFO Monson in Room H);

o.  Approximately 38 grams of suspected fentanyl (ATF Property Item # 00014) (Found by TFO Maciel in Room H);

p.  Approximately 7.5 grams of suspected crack cocaine (ATF Property Item # 00015) (Found by TFO Maciel in Room H);

q.  Approximately 1.5 grams of suspected methamphetamine (ATF Property Item # 00016) (Found by TFO Maciel in Room H);

r.  One (1) $1 bill with suspected narcotic residue (ATF Property Item # 00017) (Found by TFO Maciel in Room H);

s.  Plastic baggies (ATF Property Item # 00018) (Found by TFO Maciel in Room H);

t.  Black Coach Bag (ATF Property Item # 00019) (Found by TFO Maciel in Room H);

u.  Approximately 59.5 grams of suspected cocaine (ATF Property Item # 00020) (Found by SA Pine in Room H) (tested presumptive positively for cocaine);

v.  Approximately 100.5 grams of suspected cocaine (ATF Property Item # 00021) (Found by SA Pine in Room H) (tested presumptive positively for cocaine);

w.  Approximately 7.5 grams of suspected cocaine (ATF Property Item # 00022) (Found by SA Pine in Room H);

x.  Approximately 8.5 grams of suspected fentanyl (ATF Property Item # 00023) (Found by SA Pine in Room H);

y.  A suspected cocaine grinder (ATF Property Item # 00024) (Found by TFO Pell in Room C);

z.  Two (2) rounds of Federal .45 caliber ammunition (ATF Property Item # 00025) (Found by SA Pine in Room H);

aa. Large black scale (ATF Property Item # 00026) (Found by TFO Monson in Room H);

bb. Small scale (ATF Property Item # 00027) (Found by SA Pine in Room H);

cc. Plastic baggies (ATF Property Item # 00028) (Found by SA Pine in Room H);

dd. Black plastic box (ATF Property Item # 00029) (Found by SA Pine in Room H).

57.    When the Silver iPhone in a Dark Grey Case (ATF Property Item # 00002) was collected by TFO Sloan it was placed into Airplane Mode in order to preserve evidence. When TFO Sloan picked up the device to place it in Airplane Mode the phone opened to the below picture. Investigators noted that the photograph depicted firearms that appeared identical to several of the firearms stolen from Denver Bullets. Additionally, investigators noted that several of the firearms in the picture appeared to have price tags. Investigators did not manipulate the photograph in an attempt to zoom in on the firearms. The device was placed in Airplane Mode and seized for evidence.



58.    The Glock, model 23, .40 caliber pistol, bearing serial number BVN4254 (ATF Property Item # 00003) located by SA Gilluly was noted to be found in a laundry basket.  The Glock was loaded with 13 Rounds Winchester .40 caliber ammunition loaded inside the magazine.  The Glock was in the immediate vicinity of the Amazon box which contained ATF items 0010 to 0013.  Investigators noted the large amounts of narcotics and the several different types of narcotics is consistent with narcotics distribution.  Additionally, multiple scales and dozens of glassine baggies were located near the narcotics.

59.    SA Omansky spoke with ENRIQUEZ' girlfriend Veronique.  Veronique was not in custody or in handcuffs.  Veronique stated that she has known ENRIQUEZ since the 5th grade.  Veronique said that they reconnected a year ago and have been dating on and off again.  Veronique stated that she does not own any firearms or use any narcotics.  Veronique said she had been staying at 2221 Newark Street with ENRIQUEZ since Wednesday.  Veronique was shown still photographs of the vehicle from the surveillance footage of the firearms theft which occurred on October 25, 2023 (Fig. 3-4).  Veronique said that ENRIQUEZ drives that vehicle.  Veronique said she did not know where the vehicle was.  SA Omansky showed Veronique still photographs of ENRIQUEZ from the surveillance footage of the firearms theft (Fig. 5-7).  Veronique said ENRIQUEZ is the person in the photographs.



Fig. 3                                    Fig. 4



Fig. 5                          Fig. 6                  Fig. 7

      60.     SA Omansky spoke with ENRIQUEZ' sister Stephanie.  Stephanie was not in custody or in handcuffs.  Stephanie was shown still photographs of the vehicle from the surveillance footage of the firearms theft which occurred on October 25, 2023 (Fig. 3-4). Stephanie said that was their vehicle.  She said she drives it sometimes, but said that ENRIQUEZ and LEIVA drive the vehicle primarily.  Stephanie said she did not know where the vehicle was.

61.     Investigators are aware that narcotics traffickers commonly use multiple, prepaid, or "throw away" cellular telephones to avoid detection and elude law enforcement.  Traffickers also change cellular phones frequently or use multiple cellular phones to avoid detection by law enforcement officials.  Furthermore, traffickers commonly register cellular telephones in the names of others to avoid identification by law enforcement.

## CONCLUSION AND REQUEST

62.     Based on the information contained in this affidavit, it is your Affiant's belief that there is probable cause to believe that contained within the Devices, described in Attachment A, there exists evidence of the commission of, the fruits of crime, or instrumentalities of violations of the "Subject Offenses" as described in Attachment B.

63.     Therefore, your Affiant respectfully requests that this court issue a Search Warrant for the Devices described more fully in Attachment A, to search for the items described in Attachment B.

I, Adam Omansky, being duly sworn, depose and states under penalty of perjury that the facts stated in the foregoing affidavit are true and correct to the best of my knowledge, information, and belief.

Respectfully submitted,

*s/Adam J. Omansky*
Adam J. Omansky
Special Agent
Bureau of Alcohol, Tobacco, Firearms, and Explosives

Submitted, attested to, and acknowledged by reliable electronic means on 31  , October 2023.

United States Magistrate Judge

**Reviewed and Submitted by R. Alex Cárdenas, Special Assistant U.S. Attorney.**